**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:97-CR-259 RLW |
| | ) | |
| DARREN THOMAS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This closed criminal case is before the Court on Defendant Darren Thomas's pro se motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) (ECF No. 1195). Thomas's motion was supplemented by appointed counsel, including a second supplement that addresses the 2023 amendments to the United States Sentencing Guidelines. (ECF Nos. 1208, 1219).

The second supplemental motion seeks to reduce Defendant's sentence under two subsections of the 2023 amendments to the Sentencing Guidelines, U.S.S.G. §§ 1B1.13(b)(5) and (b)(6), which Thomas contends present independent bases for relief. First, Thomas asserts that under § 1B1.13(b)(5), a catch-all provision, he is entitled to a sentence reduction based on his rehabilitation, the unwarranted and newly created disparity between his sentence and the sentence of the most culpable codefendant, Phelix Henry Frazier, and the unusual circumstances of his original prosecution, which included a § 851 enhancement and a sentence imposed in violation of United States v. Apprendi, 530 U.S. 466 (2000). Second, Thomas asserts that under § 1B1.13(b)(6), an unusually long sentence provision, he is entitled to a sentence reduction based on the above "individualized circumstances" in combination with changes made by the First Step

Act, which shortened the applicable mandatory minimum and produce a gross disparity between his forty-year sentence and the sentence he would receive today.

In further support, Thomas also points to his documented progress toward rehabilitation, as evidenced by a spotless disciplinary record during his twenty-five years in the Bureau of Prisons, numerous classes he has taken and certificates of achievement he has been awarded, including completion of a Printer Slotter Operator apprenticeship and Quality Assurance Supervision Program, his long BOP work record, low recidivism risk and minimal violent recidivism risk, placement at a minimum security satellite camp, advanced age, strong family support, and a release plan including a stable place to live and immediate employment, and that he poses no danger to any person or to the community.

The Government opposes Thomas's motion. Its main argument is that Eighth Circuit precedent forecloses Thomas's claim that non-retroactive changes in the law can serve as a basis for sentence reduction under 18 U.S.C. § 3582(c). It further argues that the 2023 amendment to the Sentencing Guidelines permitting consideration of nonretroactive changes in the law is invalid. The Government also contends that even if the 2023 amendments were valid and could be a basis for sentence reduction, Thomas is not entitled to relief on the merits under either provision on which he bases his motion.

The Court concludes that Thomas has shown extraordinary and compelling reasons warranting a sentence reduction under U.S.S.G. § 1B1.13(b)(5)and § 1B1.13(b)(6). Consideration of the sentencing factors under 18 U.S.C. § 3553(a) indicates Thomas is not a danger to the community and it is appropriate to grant his motion for a sentence reduction. The Court will order that Thomas's sentence be reduced to time served, plus a term of 10 years' supervised release. The Court will add an additional condition of supervision of up to four months at a residential reentry center, as deemed appropriate by the U.S. Probation Office, and

will amend the terms of supervised release to remove any conditions no longer applicable and to add such new terms as are appropriate.

**Procedural History**

In September 1997, Thomas was charged by superseding indictment with one count of conspiracy to distribute and/or possess with intent to distribute in excess of one kilogram of a mixture or substance containing a detectable amount of heroin and a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a). The indictment named twenty-four co-conspirators and described a wide-ranging drug distribution conspiracy spanning January 1995 to June 1997, including the use of nine apartments or houses to facilitate drug trafficking.

The Government filed a Superseding Information pursuant to 21 U.S.C. § 851, increasing Thomas's statutory sentencing range to 20 years to life imprisonment. Most of the co-conspirators entered guilty pleas, but Thomas and three others (lead defendant Phelix H. Frazier ("Frazier"), his son Phelix T. Frazier, Jr., and Joe Robinson) proceeded to trial. United States v. Frazier, 280 F.3d 835, 841 (8th Cir. 2002). At trial, the Government presented wiretap evidence and testimony by co-conspirators and other witnesses. The evidence showed that Thomas entered the drug distribution operation in the fall of 1996 and Frazier placed him in charge of a new distribution location on North Grand in St. Louis. Thomas knew Frazier from the time they spent together in a halfway house. Thomas ran the distribution location on North Grand and recruited and directed several other co-conspirators. Thomas's supervised release was revoked sometime in March 1997.

The jury returned a guilty verdict as to all four defendants after a nine-day trial. The jury found Thomas guilty as charged in Count 1 of the Superseding Indictment. The Presentence Investigation Report ("PSR") held Thomas responsible for more than 30 kilograms of heroin, the

entire amount of heroin distributed by the twenty-four person conspiracy. The PSR applied enhancements for being a leader-organizer of the conspiracy (four points) and for possession of a firearm (two points). It concluded that Thomas and two other co-defendants were second in culpability among the co-conspirators. At sentencing, Thomas argued that the evidence at trial limited the time frame of his involvement in the conspiracy and the extent to which the acts of other co-conspirators were foreseeable, and therefore he should not be held responsible for the drug amount based on the activity of the entire conspiracy between January 1995 and June 1997. Thomas also disputed whether the leader-organizer enhancement was appropriate given his role in the conspiracy, and whether he should be held accountable for the firearm found in the North Grand distribution site on the basis of vague testimony at trial regarding the gun.

The sentencing Court, the Honorable Stephen N. Limbaugh, upheld the two-point firearm enhancement but modified the role enhancement, finding that Thomas was not a leader-organizer but was instead a manager or supervisor, leading to a three-level enhancement, and reduced the drug quantity, finding that Thomas was responsible for 10 to 30 kilograms of heroin. The Court determined that the total offense level was 41 and the criminal history category was V, resulting in a mandatory Sentencing Guidelines range of 360 months to life imprisonment. The Court imposed a sentence of 480 months of imprisonment and ten years of supervised release.

On direct appeal, the Eighth Circuit affirmed Thomas's conviction and sentence. United States v. Frazier, 280 F.3d 835 (8th Cir. 2002). As relevant here, Thomas challenged his sentence on the ground that the district court made an erroneous drug-quantity finding. Id. at 851. He argued the "drug quantity finding was inflated because the court utilized drug-sales estimates that were excessive in light of the evidence presented at trial." Id. at 852. He also claimed "the entire conspiracy's output was unforeseeable to him, and his quantity finding should have been based solely on the sales from the North Grand location that he supervised." Id. The Eighth

Circuit disagreed, finding the drug quantity estimate was supported by the evidence at trial and that, due to Thomas's managerial role and intricate involvement in the conspiracy, the quantity finding was foreseeable. Id.

Thomas also argued that the trial court's drug quantity finding violated Apprendi, which held that any fact other than a prior conviction that increases the penalty for a crime beyond the maximum penalty authorized must be submitted to the jury and found beyond a reasonable doubt. Frazier, 280 F.3d at 853 (citing Apprendi, 530 U.S. at 490). The Eighth Circuit found on plain error review that the 480-month sentence on Thomas's conspiracy conviction exceeded the maximum sentence authorized under 21 U.S.C. § 841(b)(1)(C) and was therefore erroneous after Apprendi. Id. at 854. It concluded, however, that the evidence at trial overwhelmingly established a drug quantity sufficient to authorize the sentences imposed, and consequently the jury's failure to find the amount of heroin did not seriously affect the fairness, integrity, or public reputation of the proceedings. Id. at 856. The Eighth Circuit affirmed Thomas's conviction and sentence, and the Supreme Court denied a writ of certiorari. Thomas v. United States, 122 S. Ct. 2606 (2002).

Judge Heaney concurred in the result, explaining that he was bound by Eighth Circuit precedent, but wrote to state his belief that "the court's analysis in this case circumvents Apprendi and undermines the Sixth Amendment right to a trial by jury." Frazier, 280 F.3d at 857 (Heaney, J., concurring). Judge Heaney commented that the "government's evidence against Thomas included testimony offered by several co-defendants, most of whom could not cite a first-hand observation of Thomas's direct involvement with drug manufacture or trade," and that most of the wiretapped drug transactions took place around the same time or after Thomas moved out of the North Grand location. Id. at 857-58. He stated, however, that under binding Circuit precedent "harmless error analysis applies to Apprendi errors such as Thomas's, and that

our court may infer from a jury's verdict that a particular jury would not have found less than the amount of drugs needed to authorize the sentence," as the majority had concluded. Id. at 858.

Thomas moved for a sentence reduction pursuant to Sentencing Guidelines Amendment 782 in 2015. While the Amendment reduced his total offense level, the reduction did not result in a lower Guidelines sentencing range and he was not eligible for a sentence reduction. Accordingly, appointed counsel withdrew the previously filed motion, and the Court, Judge E. Richard Webber presiding, denied Thomas's pro se motion.[1]

In November 2020, Thomas filed a pro se motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), claiming as grounds alleged violations of Apprendi and Alleyne v. United States, 570 U.S. 99 (2013), as well as the COVID-19 pandemic. He later filed two supplemental motions expanding on these claims. Appointed counsel reviewed the pro se motions and Thomas's case records and filed a notice of intent not to file a supplemental motion. Judge Webber denied Thomas's compassionate release motion in September 2021, finding he did not identify any medical condition that would make him susceptible to serious illness if he contracted COVID-19, or any other extraordinary and compelling reason listed in Sentencing Guidelines § 1B1.13. The Court further found that Thomas's history and characteristics and the nature and circumstances of the instant offense did not weigh in favor of release, and that he had not demonstrated he would not be a danger to the public if released. The Court also denied Thomas's claim to relief under Section 404(b) of the First Step Act because his offense involved heroin, not cocaine base. On appeal, the Eighth Circuit summarily affirmed the denial of compassionate release.

---

[1]The case was reassigned to Judge E. Richard Webber in 2008, following Judge Limbaugh's retirement.

On October 13, 2022, Thomas filed a pro se motion for reduction of sentence pursuant to Sentencing Guidelines Amendment 782 and 18 U.S.C. § 3582(c)(2), asking the Court to hold him accountable for distributing between one and three kilograms of heroin based on the Apprendi error. In support, Thomas cites a statement in Judge Webber's December 2020 order granting the motion of co-defendant Frazier, the leader and organizer of the conspiracy, for a sentence reduction under Section 404 of the First Step Act. Judge Webber stated in a footnote that if the Court were calculating Frazier's then-current base offense level according to the drug quantity from Count One—instead of the conviction for Continuing Criminal Enterprise in Count Two—the "drug quantity used would be in excess of one kilogram rather than the excess of 30 kilograms" because "the drug quantity must be based on the jury's verdict which convicted Defendant of possession in excess of one kilogram of heroin rather than in excess of 30 kilograms of heroin." Mem. and Order of Dec. 29, 2020 (ECF No. 1165 at 15, n.8) (citing Frazier, 280 F.3d 835).[2] Judge Webber reduced Frazier's sentence from a mandatory life sentence to 360 months, and Frazier was release by the Bureau of Prisons in January 2022.

The initial supplemental motion filed by counsel in March 2023 argues for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A) based on sentencing disparities created by Thomas's term of imprisonment. Specifically, counsel argues that Thomas's de facto life

---

[2]The Court's statement on which Thomas relies is dicta, because Defendant Frazier was sentenced to a term of life imprisonment on Count Two, continuing criminal enterprise, in violation of 21 U.S.C. § 848(a), and a provisional life sentence on Count One, conspiracy to distribute heroin and cocaine, in violation of 21 U.S.C. § 846. Frazier's sentence on Count One was to take effect only if the conviction on Count Two was overturned on appeal. Because the Count Two conviction was not overturned on appeal, the Count One sentence never took effect, though Frazier was convicted and sentenced on fourteen other counts. Thomas, in contrast, was charged and sentenced on the Count One conspiracy only. Nonetheless, as discussed infra, the Court concurs with Judge Webber's analysis and will apply it in this case.

sentence creates a disparity with his co-defendants,[3] all of whom have been released from custody; and nationwide disparities with defendants serving similarly lengthy sentences but for violent conduct, defendants who pleaded guilty rather than proceeding to trial, and defendants who were not arbitrarily subjected to enhancements under 21 U.S.C. § 851.

The second supplemental motion was filed by counsel in November 2023, after the 2023 Sentencing Guideline amendments became effective. The motion seeks to reduce Thomas's sentence under two subsections of the 2023 amendments, U.S.S.G. §§ 1B1.13(b)(5) and (b)(6),

**Legal Standard**

A court can reduce a final sentence only under the limited circumstances listed in 18 U.S.C. § 3582(c). Before passage of the First Step Act in 2018, only the Bureau of Prisons (BOP) could move courts for compassionate release. Under the First Step Act, a defendant may file a direct motion with the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" § 3582(c)(1)(A). Here, the Government does not dispute that Thomas has exhausted his administrative remedies.

Section 3582(c)(1)(A) "permits a district court to reduce a prisoner's sentence if, after considering the factors in 18 U.S.C. § 3553(a), 'it finds that extraordinary and compelling reasons warrant such a reduction' and 'that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" United States v. Taylor, 28 F.4th 929, 930 (8th Cir. 2022) (quoting 18 U.S.C. § 3582(c)(1)(A)). "In 28 U.S.C. § 994(t), Congress directed

---

[3]The Sentencing Commission considers a sentence of 470 months or longer to be a "de facto" life sentence. See U.S. Sent. Comm'n, Life Sentences in the Federal System at 10 (Feb. 2015), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf (last visited June 11, 2024).

the Commission to define 'what should be considered extraordinary and compelling reasons for [a] sentence reduction.' [Prior to the First Step Act], the Commission published its substantive definition in U.S.S.G. § 1B1.13." United States v. Rodriguez-Mendez, 65 F.4th 1000, 1002 (8th Cir. 2023).

In Application Note 1 to § 1B1.13, the Commission defined certain categories of circumstances qualifying as "extraordinary and compelling reasons" under § 3582(c)(1)(A), such as a defendant's medical condition, age, and family circumstances. Prior to November 2023, Application Note 1 also included a catch-all category of "other reasons" determined by the Director of the BOP. See U.S.S.G. § 1B1.13. The Sentencing Commission lost its quorum shortly after the First Step Act was passed, however, and therefore was "unable to update its preexisting policy statement concerning compassionate release to reflect the First Step Act's changes." United States v. Long, 997 F.3d 342, 348 (D.C. Cir. 2021). The Commission finally regained a quorum in August 2022.

Effective November 1, 2023, the Commission amended § 1B1.13 to implement the First Step Act and to explicitly address defendant-initiated motions for compassionate release. See U.S.S.G. § 1B1.13 (effective Nov. 1, 2023). The amendment identifies several circumstances that, alone or in combination, may qualify as extraordinary and compelling reasons warranting a sentence reduction. See U.S.S.G. § 1B1.13.

As relevant here, § 1B1.13, as amended, provides:

(a) In General.—Upon motion of the . . . defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

    (1)(A) extraordinary and compelling reasons warrant the reduction;
    . . . .

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13(a).

The amendment lists specific circumstances that constitute extraordinary and compelling reasons for sentence reduction, summarized as follows: (1) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; or for which needed specialized medical care is not being provided resulting in a risk of serious deterioration or death; or under certain circumstances during an infectious disease outbreak; (2) aging-related health or mental decline where a defendant is over 65 years old and has served at least ten years or 75% of the sentence; (3) certain family circumstances of the defendant relating to the need to provide care to other family members; or (4) the defendant was the victim of sexual abuse, or physical abuse resulting in serious bodily injury, committed by or at the direction of any individual who had custody or control over the defendant while in custody serving the term of imprisonment sought to be reduced.

The amendment includes two additional circumstances that may constitute extraordinary and compelling reasons for sentence reduction, and upon which Thomas relies for the instant motion: a catch-all provision that references the foregoing specific provisions, and a provision relating to unusually long sentences:

(5) Other Reasons.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraph (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6) Unusually Long Sentence.—If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has

not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

§§ 1B1.13(b)(5), (6).

The amendment further provides limitation and guidance as to a defendant's ability to rely on a change in the law as a basis for sentence reduction, apart from subsection (b)(6), unusually long sentences:

> (c) Limitation on Changes in Law.—Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

§ 1B1.13(c).

Finally, the amendment permits a court to consider a defendant's rehabilitation while serving the sentence, in combination with other circumstances, in determining whether and to what extent a sentence reduction may be warranted, but prohibits reliance on rehabilitation as the sole basis for relief. See § 1B1.13(d).

**Discussion**

A. Thomas's Eligibility Under Subsection (b)(5)—the Catch-All Provision

Thomas asserts that under § 1B1.13(b)(5), the catch-all provision, he is entitled to a sentence reduction based on his rehabilitation, the unwarranted and newly created disparity between his sentence and the sentence of the most culpable codefendant, Phelix Henry Frazier, and nationwide sentencing disparities, and the unusual circumstances of his original prosecution, which included a § 851 enhancement and a sentence imposed in violation of Apprendi, 530 U.S.

466. Thomas asserts that these reasons in combination are "similar in gravity" to the reasons identified in § 1B1.13(b)(1)-(4), as his continued incarceration is objectively as serious as that of a defendant whose health is failing, who has an incapacitated family member in need of care, or who was abused while in custody.

The Government responds that Thomas is not entitled to relief under the catch-all provision of § 1B1.13(b)(5) "because he does not allege, much less prove, anything akin to these types of circumstances related to physical condition, aging or family circumstances . . . [and] shows nothing 'similar in gravity' to the circumstances in § 1B1.13(b)(1)-(4)." (ECF No. 1226 at 26. The Government further responds that Thomas has failed to conclusively demonstrate he is no longer a danger to the community or otherwise merits release under the § 3553(a) factors, in light of the "egregious original conduct and his serious criminal history." (Id. at 2.)

The circumstances described in the first four subsections of § 1B1.13(b) are specific and fairly limited in scope. With respect to the catch-all provision, "The Commission considered but specifically rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons. Rather, they need be similar only in gravity, a requirement that inheres in the statutory requirement that they present extraordinary and compelling reasons for a sentence reduction. See 18 U.S.C. § 3582(c)(1)(A)." U.S. Sentencing Comm'n, Amendments to Sentencing Guidelines, Effective Date November 1, 2023, Supplementary Information, at 4-5 (Apr. 27, 2023).[4]

Black's Law Dictionary defines "gravity" as "seriousness of harm . . . as judged from an objective, legal standpoint." Garner, Black's Law Dictionary 721 (8th ed. 2004). In this context, "gravity" is ordinarily defined as "importance, significance; *especially*: seriousness." Merriam-

---

[4]Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (last visited June 11, 2024).

Webster Online Dictionary[5]; see also Cambridge Online Dictionary, defining gravity as "seriousness."[6]

The catch-all provision was intended to allow judges the flexibility and authority to consider whether the circumstances presented in individual cases may are sufficiently extraordinary and compelling to warrant sentence reduction:

> The Commission recognized that during the period between the enactment of the First Step Act in 2018 and this amendment, district courts around the country based sentence reductions on dozens of reasons and combinations of reasons. Based on a careful review of those cases, the Commission continues to believe what is stated in Application Note 4 to the current policy statement, *i.e.*, that judges are "in a unique position to determine whether the circumstances warrant a reduction." Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts, rather than through an effort by the Commission to predict and specify in advance all of the grounds on which relief may be appropriate.

Id. at 5.

"In sum, the catch-all exception of subsection (5) broadly applies to any extraordinary and compelling reason of similar gravity (i.e. seriousness) to the circumstances of the first four categories, even if the reason is not similar in nature and consequence to the specified circumstances in those categories." United States v. Moreira, No. 06-20021-01-KHV, 2024 WL 378032, at *3 & n.3 (D. Kan. Jan. 31, 2024).

There are a number of significant circumstances this Court considers in evaluating whether Thomas shows extraordinary and compelling reasons for a sentence reduction. The first circumstance is the unusually harsh length of Thomas's sentence in absolute terms.[7] Thomas was

---

[5]Available at www.merriam-webster.com/dictionary/gravity (last visited June 11, 2024).

[6]Available at https://dictionary.cambridge.org/us/dictionary/english/gravity (last visited June 11, 2024).

[7]For purposes of its analysis under § 1B1.13(b)(5), this Court expressly states that it is not comparing Thomas's sentence to the sentence he would be likely to receive today, or considering any nonretroactive change in the law. Instead, the severity of Thomas's sentence, of itself, is one of the

sentenced to forty years in prison for participating in a heroin and cocaine distribution conspiracy for approximately four months, and in which the Government did not allege that any victims were physically harmed. The 480-month sentence he received is ten months longer than the 470-month sentence the Sentencing Commission considers a de facto life sentence.

Thomas's sentence is an outlier when compared with national data. According to the Sentencing Commission, sentences of incarceration of 470 months or longer are rare. "As of January 2015, there were 1,983 offenders in the BOP system serving a sentence of incarceration of 470 months or longer. They accounted for 1.1 percent of all federal sentenced offenders." U.S. Sent. Comm'n, Life Sentences in the Federal System at 10 (Feb. 2015).[8] The Sentencing Commission analyzed such sentences imposed in fiscal year 2013 and determined that the most common offense for which a de facto life sentence was imposed was firearms (76 cases), accounting for 45.2 percent of all de facto life sentence cases. The next most common offenses in were child pornography (55 cases), drug trafficking (10 cases), and sex abuse (6 cases). "Even so, sentences of this length were rare in those types of cases, accounting for just 2.9 percent of all child pornography sentences, 0.04 percent of drug trafficking sentences, and 1.4 percent of the sentences in sex abuse cases." Id. at 11. Common factors for such sentences include aggravating roles in the offense and use of a weapon in connection with the offense. Id. at 11-12. The Sentencing Commission observed that "[i]n most of the de facto life imprisonment cases, the sentencing guidelines appear to have had a strong influence on the court's decision," id. at 12, and noted that "[o]ne of the factors leading to the high sentencing ranges in these cases could be the high trial rate. Among the 168 de facto life sentence cases, the offender was convicted after a

combination of circumstances that factors into the Court's determination that Thomas presents extraordinary and compelling reasons for reduction of his sentence.

[8]Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/ miscellaneous/20150226_Life_Sentences.pdf (last visited June 11, 2024).

trial in 89 cases, which represents a trial rate of 53.0 percent, substantially higher than the overall trial rate of 3.1 percent for fiscal year 2013. The presence of a mandatory minimum penalty in virtually all of these cases likely had a significant impact on the offender's decision to take the case to trial." Id. at 14.

The Sentencing Commission published an updated research paper on life sentences in the federal system in July 2022, analyzing data from fiscal years 2016 to 2022. During that time period, 799 offenders were sentenced to de facto life imprisonment, accounting for 0.2 percent of the total federal offender population. U.S. Sent. Comm'n, Life Sentences in the Federal System at 3 (July 2022).[9] Half of these were convicted of sexual abuse, and 8.1 per cent were convicted of drug trafficking crimes. Id. at 18. Approximately nine in ten de facto life sentences were imposed for a violent offense. Id. Offenders who received de facto life imprisonment were more likely to be sentenced after trial: 39.4 percent went to trial compared to the 2.3 percent trial rate for all other federal offenders. Id. at 24.

Sentencing Commission data from fiscal years 2013 to 2022 shows that drug trafficking offenders sentenced under U.S.S.G. § 2D1.1, like Thomas, received average sentences of approximately 72 months for powder cocaine distribution and 66 months for heroin distribution.[10] For fiscal year 2022, the average sentence length was 68 months for powder cocaine distribution and 66 months for heroin distribution.[11]

_____

[9]Available at https://www.ussc.gov/research/research-reports/life-sentences-federal-system (last visited June 11, 2024).

[10]U.S. Sentencing Commission, 2022 Annual Report and Sourcebook of Federal Sentencing Statistics at 126, Figure D-5, Sentence Length of Drug Trafficking Offenders by Major Drug Type Over Time, available at https://www.ussc.gov/research/sourcebook/archive/sourcebook-2022 (last visited June 11, 2024).

[11]Id. 124, Figure D-3, Sentence Length of Drug Trafficking Offenders by Major Drug Type, Fiscal Year 2022.

Thomas's sentence is also unusually long when compared to the time his co-defendants served in prison. The Court is mindful that the statutory direction to avoid unwarranted disparities among defendants refers to national disparities, not differences among co-conspirators, United States v. Pierre, 870 F.3d 845, 850 (8th Cir. 2017), but Congress has made clear instruction to ensure that sentences account for the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

Thomas is the only one of the twenty-four defendants who remain in BOP custody. Thomas's three co-defendants who also went to trial were sentenced to terms of life imprisonment and eight years supervised release (Frazier, on Counts Two, Four, Five, Six, Seven, Eight, Nine, Eleven, Twelve, Thirteen, Fourteen, Fifteen, and Sixteen, and two forfeiture counts); 380 months imprisonment and five years supervised release (Joe Robinson, on Counts One and Three); and 120 months and five years supervised release (Phelix T. Frazier, Jr. ("Frazier, Jr."), on Count One and a forfeiture count). Of these, Frazier was the leader and organizer of the drug conspiracy, Thomas was in the second culpability group, Joe Robinson was in the fifth culpability group, and Frazier, Jr. was in the ninth culpability group.

Frazier's life sentence was later reduced to 360 months pursuant to 18 U.S.C. § 3582(c)(2) based on Amendment 782 to the Sentencing Guidelines. Frazier was released from the BOP on January 18, 2022, and is on supervised release. Frazier was the organizer and leader of the conspiracy. Starting in January 1995, he regularly traveled to California, and sometimes to Chicago, to obtain large quantities of heroin. In St. Louis, he employed workers who distributed heroin to users and collected the money from daily sales at the end of each day. Frazier directed his employees, including Thomas, to take orders from customers, distribute heroin, and remit the proceeds to him. Frazier engaged in money laundering and structuring transactions to avoid

reporting, as he converted the cash proceeds from the sales to cashier's checks, which he used to purchase residential and commercial real estate from which the conspirators operated. Frazier's offense conduct was far more serious and lasted much longer than Thomas's. Frazier conceived, organized, and oversaw an extensive drug distribution network with 24 employees who operated out of at least nine different locations from January 1995 until June 1997. He also assaulted a drug enforcement task force agent while the agent was engaged in official duties.

Thomas, in contrast, ran one distribution site under Frazier's direction for approximately four months in 1996 and 1997. The PSR states with respect to his conduct:

> On or about February 7, 1997, Darren Thomas possessed thousands of empty capsules to be utilized for drug distribution.

PSR, ECF No. 1103 at 9, ¶ 10.[12]

> Darren Thomas, who was one of the leaders or organizers of the criminal activity is accountable for the entire amount of heroin and cocaine.[13] According to government officials, Thomas set up the drug house located at 4118 North Grand, St. Louis, Missouri, recruited Andre Jones, and directed the activities of Carla Crocker, Rebekah Daramola, Phyllis Leach, Winford (last name unknown), a/k/a "Whimp", and "Sonny" (last name unknown). The drug house located at 4118 North Grand was in full operation between the late summer or early-fall of 1996 until March of 1997. During trial testimony by Andre Jones, it was learned that the home located at 4118 North Grand contained a shotgun which was used for protection.

> According to the government's evidence (the bulk of which was obtained by Title III wiretaps, statements of witnesses, and surveillance by law enforcement authorities), Phelix H. Frazier was most culpable since he was the organizer and leader of the conspiracy and profited to the greatest extent. Second in culpability were Damon Robinson, William Gibson, and Darren Thomas.

Id. at 13-14, ¶¶ 39-40.

---

[12] The page references for Thomas's PSR are to the page numbers on the CM/ECF header, not the page numbers on the PSR itself.

[13] As stated above, Judge Limbaugh disagreed with Probation's conclusion that Thomas was an organizer/supervisor of the conspiracy under U.S.S.G. § 3B1.1A, and concluded he was a manager or supervisor under § 3B1.1B.

Co-defendant Joe Robinson was sentenced to 380 months imprisonment and five years supervised release and his term of imprisonment was later reduced to 342 months in June 2015 pursuant to Amendment 782, which lowered his sentencing range. (ECF Nos. 1092, 1111).

The PSR described Joe Robinson's role in the offense as follows:

> In summary, the instant offense involved a large-scale conspiracy, headed by Phelix H. Frazier, during which in excess of 30 kilograms of heroin and an amount of cocaine was either distributed or possessed with the intent to distribute. The government reported that **Robinson** was accountable for in excess of 30 kilograms of heroin, an amount of cocaine that would not affect the base offense level, and the possession of a firearm. During the conspiracy, **Robinson** operated as a mixer of heroin for retail sale to customers. **Robinson** was a manager/supervisor over one ·of the drug distribution houses which entailed taking phone orders from the customers for heroin or cocaine, giving the ordered narcotics for distribution to the "runners/distributors" and collecting the money obtained from the sale from the "runners". In this role, at the end of each shift, **Robinson** paid the other members for their daily sales, paid himself and turned the remainder of the proceeds to those higher in rank in the conspiracy, all at the direction of Phelix H. Frazier and other persons.

> According to the government's evidence (the bulk of which was obtained by Title ill wiretaps, statements of witnesses, and surveillance by law enforcement authorities), Phelix H. Frazier was most culpable since he was the organizer and leader of the conspiracy and profited to the greatest extent. Second in culpability were Damon Robinson, William Gibson, and Darren Thomas. Third in culpability were Brian Heard, Ann Hinton, and Rebekah Daramola. The fourth level of culpability consisted of Jessie Lewis and Hilda Andrews. Fifth in culpability were Carla Crocker, **Joe Robinson**, and Prentess Flenoid.

Joe Robinson PSR, ECF No. 1092-1 at 13, ¶¶ 33-34.[14]

Robinson, like Thomas, was found accountable for in excess of 30 kilograms of heroin, and received offense level increases for possession of a dangerous weapon and for acting as a manager/supervisor of the criminal activity which involved five or more participants. Id. at 10-11, ¶ 45. Robinson's criminal history category was III. Id. at 14, ¶ 66. Like Thomas, Robinson received offense level adjustments for committing the instant offense while on probation, and

---

[14]References to page numbers in Joe Robinson's PSR are to the page numbers on the CM/ECF header, not the page numbers on the PSR itself.

less than two years after his release from imprisonment. Id. at 18, ¶¶ 64, 65. Robinson's guideline imprisonment range was life. Id. at 20, ¶ 85. He was released from the BOP in January 2022.

Thomas's co-defendants who were determined to be equally culpable to him, but who pleaded guilty rather than electing to go to trial, received markedly shorter sentences. Each received a three-level adjustment for acceptance of responsibility, but this offense level reduction cannot fully explain the discrepancies among the sentences imposed.

William Gibson was sentenced to 228 months imprisonment and five years of supervised release. Gibson's PSR described his role in the conspiracy as equal in culpability to Thomas and Damon Robinson, and stated:

> Through law enforcement investigation, it was determined that Hughes operated as a street level distributor of heroin and cocaine under the direction of others including **Gibson**, Rebekah Daramola, Hinton and Robinson. Hughes received money from the conspiracy for his role in distributing the narcotics to the consumer and then returning the payments for the drugs to others in the conspiracy.

> In summary, the instant offense involved a large-scale conspiracy, headed by Phelix H. Frazier, during which in excess of 30 kilograms of heroin and an amount of cocaine was either distributed or possessed with the intent to distribute. Of this amount, **Gibson** was accountable for at least ten but less than thirty kilograms of heroin, an amount of cocaine that would not affect the base offense level, and the possession of a firearm. During the conspiracy, **Gibson** operated as a mixer of heroin for retail sale to customers, collected money from daily drug sales and acted as a manager/supervisor over one or more of the drug distribution houses. **Gibson** collected the drug proceeds from the distribution houses and delivered the money to those higher ranked in the conspiracy including Phelix H. Frazier and Damon Robinson. **Gibson** worked with others to insure that the distribution houses had weapons available for protection. **Gibson** was paid for his role in the offense.

> According to the government's evidence (the bulk of which was obtained by Title ID wiretaps, statements of witnesses, and surveillance by law enforcement authorities), Phelix H. Frazier was most culpable since he was the organizer and leader of the conspiracy and profited to the greatest extent. Second in culpability were Damon Robinson, **William Gibson**, and Darren Thomas.

19

Gibson PSR, ECF No. 543 at 8-9, ¶¶ 30-32.

Like Thomas, Gibson received additional offense levels for possession of a firearm and for acting as a manager/supervisor of criminal activity which involved five or more participants. Gibson's criminal history category was VI, higher than Thomas's. Gibson was sentenced to a sentence more than 20 years shorter than Thomas's, for essentially the same conduct. Gibson was released from the BOP in June 2014, and his five-year term of supervised release was terminated in March 2016 after he completed 21 months of the term.

Co-defendant Damon Robinson, also equal in culpability to Thomas and Gibson, pleaded guilty and was sentenced to 188 months and five years supervised release on Count One. The PSR described Damon Robinson's role in the conspiracy as follows:

> In summary, the instant offense involved a large-scale conspiracy, headed by Phelix H. Frazier, during which in excess of 30 kilograms of heroin and an amount of cocaine was either distributed or possessed with the intent to distribute. Of this amount, **Damon Robinson** was accountable for at least ten but less than 30 kilograms of heroin, and an amount of cocaine that would not affect the base offense level. During the cons[p]iracy, **Damon Robinson**, as an organizer, leader, and manager over one or more of the drug distribution houses, operated as a mixer of heroin for retail. sale to consumers, collected money from other co-conspirators at drug distribution houses, and, on several occasions, delivered the money to Frazier or directed others to deliver money derived from drugs sales to Frazier. **Robinson** also supplied cocaine to Frazier during the life of the conspiracy. **Damon Robinson** was paid for his role in the conspiracy.
>
> According to the government's evidence (the bulk of which was obtained by Title III wiretaps, statements of witnesses, and surveillance by law enforcement authorities), Phelix H. Frazier was most culpable since he was the organizer and leader of the conspiracy and profited to the greatest extent. Second in culpability were **Damon Robinson**, William Gibson, and Darren Thomas.

Damon Robinson PSR, ECF No. 420 at 8, ¶¶ 33-34. Robinson's criminal history category was lower than Thomas's at II. Robinson received a two-level role in the offense adjustment for being an organizer, leader, and manager or supervisor in the criminal activity, but received no firearm enhancement. His sentence was almost 25 years shorter than Thomas's. Robinson was

released from the BOP in January 2011 and his five-year term of supervised release was terminated in December 2013, approximately 26 months early.

Gibson and Damon Robinson each managed one or more of the drug distribution houses, like Thomas, but appear to have participated throughout the life of the conspiracy. These defendants were held accountable for at least ten but less than 30 kilograms of heroin giving them base offense levels of 36, while Thomas, who participated in the conspiracy for four months, was initially held accountable for the entire amount of heroin involved in the conspiracy and had a base offense level of 38. This initial discrepancy in drug quantity among equally culpable defendants, which was the main reason for Thomas's higher sentencing range, is likely the result of Gibson and Robinson's plea negotiations with the Government.

When Thomas's sentence is compared to that of equally culpable co-defendants who pleaded guilty, and to the sentences of the three next most culpable co-defendants—who also pleaded guilty—it appears that defendants who elected to exercise the right to trial were sentenced far more harshly. Rebekah Daramola was third in culpability. Thomas's PSR states that she operated as a manager/supervisor over several of the drug distribution houses, in contrast to Thomas's management/supervision of one for a limited time. Daramola took phone orders from customers for heroin and cocaine capsules and gave the narcotics to runners/distributors for delivery to the consumers. The runners/distributors turned the proceeds over to Daramola, who paid other members of the conspiracy for their daily sales or narcotics, deducted her own pay, and turned the remaining proceeds over to others involved in the conspiracy at the end of the day/shirt. Daramola worked at the direction of Frazier, and with others, including Thomas. (ECF No. 1103-1 at 8, ¶ 7.) Daramola also participated in money laundering and structuring transactions to avoid reporting. (id. at 10, ¶¶ 15-16), and purchased a shotgun that was seized at one of the drug distribution houses (id. at 13, ¶ 37). Nonetheless, Daramola was sentenced to 100

months imprisonment and five years supervised release on Counts One, Ten, Eleven, Twelve, and Fourteen of the superseding indictment. The additional counts of Daramola's conviction were for knowing and intentional possession with the intend to distribute heroin and cocaine (Ten), money laundering (Eleven), and structuring transactions to avoid reporting (Twelve and Fourteen). Daramola was released from the BOP in December 2005. Two other co-defendants also third in culpability were sentenced to 108 months imprisonment and five years supervised release on Count One (Brian Heard), and 100 months imprisonment and five years supervised release on Counts One and Three (Ann Bohlen Hinton).

Further evidence of much harsher sentences for those who went to trial is demonstrated by comparing the sentence of co-defendant Frazier, Jr. to equally culpable co-defendants who pleaded guilty. Frazier, Jr. was in the ninth culpability group, the next to the least culpable. He was sentenced to 120 months and five years supervised release. Frazier's two equally culpable co-defendants who did not go to trial were sentenced to 20 months imprisonment and five years supervised release (Lisa Ryan), and four years of probation and 40 hours of community service (Rochelle Fry).

The Court also considers the fact that Thomas appears to have been the only defendant in this case against whom the Government filed an information under 21 U.S.C. § 851, which doubled Thomas's mandatory maximum sentence and contributed to the unusual length of his sentence.

The Court finds it would be a grave injustice to allow Thomas to remain in prison for another seven years, until August 1, 2031[15], while the organizer of the conspiracy—who was far more culpable and was originally sentenced to life—was afforded the opportunity to return to the

---

[15]See Federal Bureau of Prisons, Find an Inmate, https://www.bop.gov/inmateloc/ (last visited June 11, 2024).

community in January 2022. Further, the two co-defendants who were equally culpable with Thomas but did not go to trial, received sentences twenty and twenty-five years shorter than his, were released in 2011 and 2014, and were released early from supervision.

Another factor the Court considers is the Apprendi error that resulted when the trial court did not submit to the jury the issue of determining the drug quantity for which Thomas was responsible, but instead determined the quantity itself at sentencing. As a result, Thomas's 480-month sentence improperly exceeded the maximum sentence authorized under 21 U.S.C. § 841(b)(1)(C). The Eighth Circuit acknowledged that the Apprendi error was "both plain and affects [Thomas's] substantial rights," but nonetheless concluded it "did not seriously affect the fairness, integrity, or public reputation of the proceedings," based on the evidence presented at trial.  280 F.3d at 855.

Judge Heaney concurred "reluctantly" in the decision as to Thomas and wrote separately to "express [his] concerns about the majority's reasoning." Judge Heaney identified "two central problems with the majority's analysis," id. at 857, and undertook an independent analysis of the law and evidence that led to the following findings and conclusions:

> First, as this court did in *United States v. Anderson,* 236 F.3d 427 (8th Cir. 2001), the majority applies the harmless error analysis from *Johnson v. United States,* 520 U.S. 461 (1997) to uphold Thomas's sentence. I do not believe, however, that *Johnson* supports the application of harmless error analysis to the *Apprendi* error in Thomas's case.
>
> In *Johnson,* the Supreme Court decided that despite the jury's failure to decide the issue of materiality in a perjury case, reversal was not warranted because the error did not seriously affect the "fairness, integrity or public reputation of the judicial proceedings." 520 U.S. at 470. The Court found the error harmless because evidence of materiality was essentially uncontroverted at trial. The petitioner was found guilty of making false statements while testifying before a grand jury that was investigating her long-time boyfriend's alleged investment of proceeds from drug trafficking in real estate. The petitioner falsely testified about the source of the tens of thousands of dollars she used to improve her home when, in truth, her long-time boyfriend was involved in financing the purchase of and improvements to her home. Because the grand jury was

investigating her boyfriend's real estate investments, the Court found that there was no plausible argument that petitioner's false statements were immaterial. Indeed, materiality is evident from this brief recitation of the facts.

The issue of drug quantity, however, can be more difficult to prove than that of materiality. When considering whether the trial court's error under *Apprendi* is harmless, this court must ask whether there is any reasonable doubt that the evidence before the jury would have led it to convict Thomas of less than the 100 grams of heroin needed to authorize his sentence. *United States v. Anderson,* 257 F.3d 924, 925 (8th Cir.2001) (M. Arnold, dissenting). While there is ample evidence that would allow a jury to conclude that more than 100 grams of heroin was involved in this conspiracy, it is unclear to me that the evidence proves beyond a reasonable doubt that defendant Thomas "knowingly and intentionally" conspired to distribute a quantity of heroin in excess of 100 grams. *See* 21 U.S.C. § 841(a). The government's evidence against Thomas included testimony offered by several co-defendants, most of whom could not cite a first-hand observation of Thomas's direct involvement with drug manufacture or trade. The government also produced recordings of wiretapped telephone drug orders to the North Grand location and ledger sheets recording drug distribution; however, from the record, it seems these drug transactions occurred at about the same time or after Thomas moved out of the North Grand location. Although the jury concluded that Thomas was involved in the conspiracy, the evidence regarding the conspiracy does not patently prove beyond a reasonable doubt that Thomas knowingly and intentionally conspired to distribute a particular amount of heroin.

Next, I do not believe that it is consistent with the Sixth Amendment for our court to sustain Thomas's sentence merely because we have decided that no jury that convicted Thomas of conspiring to distribute heroin could have found him responsible for less than the 100 grams needed to authorize his sentence. Even though our court applied this analysis in *Anderson,* I believe the correct question should be whether the evidence proved beyond a reasonable doubt that Thomas conspired with others to distribute more than 100 grams of heroin. The majority's conclusion, that no jury that found Thomas guilty of the conspiracy could also find less than 100 grams of heroin, requires the reviewing court to look into the thought process of the jury rather than conclude that the evidence, on its face, proves that the conspiracy involved a certain drug quantity beyond a reasonable doubt. In *Johnson,* the Supreme Court had overwhelming evidence of materiality—it did not have to look to the jury's other findings to determine whether materiality had been proven. That is not the case here, and I think it is dangerous precedent for a court of appeals to extrapolate from a jury's verdict other facts that, in error, the jury was not instructed to decide.

I believe that the failure of the trial court to submit to the jury each factor that could subject Thomas to punishment beyond the maximum sentence authorized by 21 U.S.C. § 841(b)(1)(C) seriously affects the "fairness, integrity, [and] public reputation of the proceeding." *Johnson,* 520 U.S. at 469. Nonetheless, until such time as *United States v. Anderson* is overturned by an en

banc panel of this court, I am bound by this circuit's analysis that *Johnson*'s harmless error analysis applies to *Apprendi* errors such as Thomas's, and that our court may infer from a jury's verdict that a particular jury would not have found less than the amount of drugs needed to authorize the sentence. I reluctantly concur.

Frazier, 280 F.3d 835, 857-58 (Heaney, J., concurring) (parallel citations omitted).

This Court did not hear the evidence firsthand. It is, however, forcefully struck by Judge Heaney's conclusion that "although the jury concluded Thomas was involved in the conspiracy, the evidence regarding the conspiracy does not patently prove beyond a reasonable doubt that Thomas knowingly and intentionally conspired to distribute a particular amount of heroin," id. at 858, and his ultimate conclusion that the Apprendi error seriously affected the fairness, integrity, and public reputation of Thomas's trial. Id. That an Eighth Circuit judge reached these conclusions after careful review of the trial evidence can only be considered a matter of great seriousness. This leads the Court to conclude that the Apprendi error is an circumstance that weighs in favor of a finding that Thomas establishes extraordinary and compelling reasons for a sentence reduction.

Other circumstances also support sentence reduction under § 1B1.13(b)(5). Thomas has submitted substantial evidence of his rehabilitation in the years since his conviction, which this Court can consider alongside other factors when determining if extraordinary and compelling reasons for sentence reduction exist.

Thomas is currently at the FCI Terre Haute minimum security camp, the lowest security category of BOP facilities. Minimum security camps are "work- and program-oriented" and feature dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing.[16] Thomas establishes that he has made productive use of his time while incarcerated,

---

[16] See Federal Bureau of Prisons, About Our Facilities, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited June 11, 2024).

through steady employment and numerous educational, vocational, and athletic achievements. These accomplishments to better himself are the more admirable because Thomas had no reason to believe he would leave prison until he was almost 70 years old. As of March 2023, he had worked 6,400 hours and completed an Apprenticeship as a Printer-Slotter Operator and completed the Quality Assurance Supervision Program. Thomas has worked in UNICOR in customer service as a verifier, was employed at his previous institution in the commissary for trust fund, and is employed at his current institution. He has taken numerous courses including project management, business management, mentoring, law, long-distance parenting, public speaking, tutor training, consumer skills, smart money, real estate, child custody, career counseling, job development, computer, word processing, Spanish, and literary composition. Thomas has participated in many sports activities, trained to be a sports referee, and served as sports commissioner.

Thomas also establishes that his disciplinary history while incarcerated has been exemplary. Remarkably, Thomas has not received a single conduct violation in 25 years of imprisonment. Another district judge has commented that "[e]ven the most rule-abiding among us would likely collect a few disciplinary infractions if subject to a host of rules governing the minutiae of daily life and monitored around-the-clock—for decades." United States v. Brown, No. 2:95-cr-66(2), 2024 WL 409062, at * 9, __ F.Supp.3d __ (S. D. Ohio Feb. 2, 2024). This is not true of Thomas, however, and this is a circumstance that weighs in his favor.

Section 1B1.13(b)(5) requires the Court to consider whether these circumstances, in combination, are similar in gravity to one of the following: medical circumstances of the defendant, agent of the defendant, family circumstances of the defendant, or sexual or physical abuse of the defendant while incarcerated. The Court concludes that Thomas's circumstances, in combination, are of similar gravity, with particular emphasis given to the unusual length of

Thomas's sentence, of itself and when compared to sentences imposed nationwide; the fact that the most culpable defendant in the conspiracy was released over two years ago, the defendants equal in culpability to Thomas were released ten years ago, and all other co-defendants have been released; and the Apprendi error in Thomas's trial, which calls into question its fairness. The Court therefore finds that Thomas establishes extraordinary and compelling reasons for a reduction of his sentence.

B. Section 3553(a) Factors

Section 1B1.13 of the Sentencing Guidelines further provides that a court may reduce a term of imprisonment only if it determines that "[t]he defendant is not a danger to the safety of any other person or to the community[,]" U.S.S.G. § 1B1.13(3), and only after it considers the factors set forth in 18 U.S.C. § 3553(a).

The Court finds that the factors listed in 18 U.S.C. § 3553(a) weigh in favor of reducing Thomas's sentence. Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here. The applicable factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a).

The nature and circumstances of the offense were serious. Thomas's conviction is for participation in a large-scale conspiracy to distribute illegal narcotics, primarily heroin. It was not a crime of violence, however, and Thomas's offense conduct was nonviolent.

As for the history and characteristics of the defendant, Thomas's personal history reveals he was born and raised in St. Louis by his mother and maternal grandparents. He graduated from high school and attended one semester of college. Thomas worked at several jobs during the late 1980s and 1990s until his 1997. Thomas's criminal history includes two 1982 state convictions for carrying a concealed weapon and possession of marijuana; a 1991 federal conviction for possession of an unregistered firearm and felon in possession of a firearm; and a 1993 federal conviction for distribution of heroin.

The Court considers the need for the sentence imposed to serve the enumerated purposes of punishment. Id. § 3553(a)(2). The court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes." Id. § 3553(a). The Court finds the 480-month sentence was greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from Thomas's crimes.

Applying the § 3553(a) factors in this case, the Court finds a reduction of Thomas's sentence to time served is appropriate under 18 U.S.C. § 3582(c)(1)(A). Thomas has served over twenty-five years in the BOP, which is long enough to reflect the seriousness of his offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from his crimes. To prolong Thomas's incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment, and would be unjust, because his punishment has already exceeded that

of the conspiracy's far more culpable organizer. A sentence of time served would also serve to mitigate a sentencing disparity with defendants with similar records who have been found guilty of similar conduct.

The Court considers whether Thomas presents "a danger to the safety of any other person or to the community[.]" U.S.S.G. § 1B1.13(2). Factors relevant to this inquiry include: (1) the nature and circumstances of the offenses of conviction; (2) the weight of the evidence; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

The first three factors have been discussed, so the Court focuses on the nature and seriousness of the danger posed by Thomas's release. The Court cannot say that Thomas poses no risk at all to public safety, based on the circumstances of this offense and his prior convictions, but finds the risk of Thomas engaging in further criminal conduct is low, as reflected by his BOP pattern score. The BOP has significant expertise in evaluating offenders' risk levels and the Court gives consequent consideration to its evaluation of Thomas. Thomas's record of steady employment, educational attainments, and perfect conduct while in prison offer strong support for the conclusion that he would not be a danger to the community if released, because Thomas's "exemplary postsentencing conduct may be taken as the most accurate indicator of his present purposes and tendencies[.]" Pepper v. United States, 562 U.S. at 476, 492 (citing 18 U.S.C. § 3553(a)(1)).

In addition, Thomas will have a ten-year term of supervised release after his custodial sentence ends, and the support and oversight of the U.S. Probation Office further reduces any potential danger to the community from his early release. Thomas's demonstrated ability and willingness to comply with institutional rules is persuasive evidence that he will comply with the conditions of supervised release and his probation officer's instructions.

Thomas has a strong release plan, and identifies the family support that awaits him upon release. His daughter, who was thirteen years old and in the 8th grade when Thomas went to prison in 1998, states that she shares a "great relationship" with her father, owns a three-bedroom home in Bridgeton, Missouri where he is welcome to live, and owns a vending machine business that she says Thomas can help her with. Thomas's sister in Little Rock, Arkansas states that she is "more than willing to provide [him] with means of support, motivation, and love." Thomas also has an open job offer from MERS Goodwill to load and unload trailers. Upon release, the United States Probation Office in this District will supervise Thomas and provide structure and support through its numerous programs designed to facilitate reentry into society.

On balance, the Court concludes that the applicable § 3553(a) factors support Thomas's request for a reduction in sentence. Thomas's motion for a sentence reduction will be granted to time served, pursuant to § 1B1.13(b)(5).

C. Thomas's Eligibility Under Subsection (b)(6)—the Unusually Long Sentence Provision

Thomas asserts a second, independent basis for sentence reduction under U.S.S.G. § 1B1.13(b)(6), the unusually long sentence provision. Thomas contends he is entitled to a sentence reduction based on the "individualized circumstances" discussed above, in combination with changes made by the First Step Act, which shortened the applicable mandatory minimum and produce a gross disparity between his forty-year sentence and the sentence he would receive today.

### 1. The Court's Authority to Consider Non-Retroactive Changes in the Law as a Basis for Sentence Reduction

As a threshold matter, the Government argues that binding Eighth Circuit precedent forecloses Thomas's claim that non-retroactive changes in the law can serve as a basis for

sentence reduction under 18 U.S.C. § 3582(c), and that the 2023 amendment to the Sentencing Guidelines permitting consideration of nonretroactive changes in the law is invalid. These arguments relate only to § 1B1.13(b)(6), the unusually long sentence provision.

The Government argues that any reliance on a nonretroactive change in the law as a basis for sentence reduction is foreclosed by the Eighth Circuit's decisions in United States v. Crandall, 25 F.4th 582 (8th Cir. 2022), and United States v. Rodriguez-Mendez, 65 F.4th 1000 (8th Cir. 2023),. This Court has previously considered and rejected this argument. See United States v. Capps, 1:11-CR-108 AGF, 2024 WL 880554, at *6-7 (E.D. Mo. Jan. 31, 2024). This Court agrees with Judge Audrey G. Fleissig's analysis of this issue in Capps, and adopts her careful and persuasive reasoning. In sum, Crandall and Rodriguez-Mendez were decided before the 2023 amendment took effect, and to the extent Rodriguez-Mendez discussed the proposed amendment, the discussion was non-binding dicta which appears to contradict the plain reading of subsection (b)(6). Further, this Court is bound by the applicable policy statement. See Crandall, 25 F.4th at 584 ("Although a policy statement standing alone may be merely 'advisory,' . . . the statute in this case makes consistency with an applicable policy statement a *mandatory* condition for a reduction in sentence.") (citations omitted); see also Stinson v. United States, 508 U.S. 36, 44-45 (1993) (holding commentary to the Sentencing Guidelines is to "be treated as an agency's interpretation of its own legislative rule" and given "controlling weight unless it is plainly erroneous or inconsistent with" the guideline it interprets).

The Supreme Court has acknowledged that Congress delegated to the Sentencing Commission "broad" and "significant discretion in formulating guidelines for sentencing convicted federal offenders." United States v. LaBonte, 520 U.S. 751, 757 (1997). It has described the sentencing commission as a "peculiar institution," Misretta v. United States, 488 U.S. 361, 384 (1989), and noted its "unusual explicit power to determine whether and to what

extent its amendments reducing sentences will be given retroactive effect, 28 U.S.C. § 994(u),"

Braxton v. United States, 500 U.S. 344, 348 (1991).

The Government also argues that the Sentencing Commission exceeded its Congressionally delegated authority in promulgating subsection (b)(6), because the Commission cannot act contrary to the statute. It asserts that subsection (b)(6) conflicts with 18 U.S.C. § 3582(c)(1)(A)'s plain text, context, and purpose, as Congress expressly declined to make statutory changes retroactive, and nonretroactive changes to sentencing law are neither extraordinary nor compelling. Finally, it argues the subsection raises separation of powers concerns because it contradicts Congress's deliberate choice not to make the change in sentencing law here retroactive.

This Court has also previously considered and rejected these same arguments. The Court concurs in and adopts as its own Judge Fleissig's reasoning in doing so:

> The Court disagrees. "Congress is not shy about placing [sentencing modification] limits where it deems them appropriate." Concepcion [v. United States], 597 U.S. [481] at 494 [(2022)]. In this case, Congress broadly empowered and directed the Commission to issue binding guidance as to what circumstances qualify for potential reduction. See § 3582(c)(1)(A). Nothing in the statute's text prohibits the Commission from considering nonretroactive changes in the law as extraordinary and compelling reasons for a sentence reduction.
> The absence of any such limitation is telling. Congress could have drafted such a blanket prohibition into § 3582(c)(1)(A), as it did in 28 U.S.C. § 994(t) by specifying that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." See also Concepcion, 597 U.S. at 483 ("Congress has shown that it knows how to direct sentencing practices in express terms."). Congress chose not to impose a similar prohibition with respect to nonretroactive changes in the law.
>
> The Government also echoes the Eighth Circuit's concern expressed in Crandall that considering nonretroactive change in the law as a ground for a sentence reduction would result in a "freewheeling opportunity for resentencing" with no "sound limiting principle." Crandall, 25 F.4th at 586. However, the Commission squarely addressed that concern when drafting subsection (b)(6), by narrowly limiting the circumstances in which a defendant may be resentenced. Rather than categorically permitting relief based on

nonretroactive changes in the law, subsection (b)(6) requires a case-specific, context-based determination and allows for relief only in those cases where a defendant has served (i) at least 10 years (ii) of an unusually long sentence, and (iii) a change in law has produced a "gross disparity" between the sentence being served and the sentence likely to be imposed at the time the motion is filed.

As with legislative rules adopted by federal agencies, guidelines and policy statements such as the amended § 1B1.13 are a matter of the Commission's "particular area of concern and expertise," and as a result of an express congressional delegation of authority, the "Commission itself has the first responsibility to formulate and announce" such policy statements. Stinson, 508 U.S. at 45. When "Congress entrusts to the [Commission], rather than to the courts, the primary responsibility for interpreting the statutory term[,] ... [a] reviewing court is not free to set aside [that interpretation] simply because it would have interpreted the statute in a different manner." Batterton v. Francis, 432 U.S. 416, 425 (1977). Indeed, as the Commission notes in its commentary, the Government itself has on several occasions successfully blocked Supreme Court review of the issue of whether nonretroactive changes in the law may be considered under § 3582(c)(1)(A) as extraordinary and compelling reasons on the ground that the issue "should be addressed first by the Commission." See Official Commentary, https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf, at p. 6 (citing the Department of Justice's opposition to grant of certiorari in various cases).

The Commission has now addressed the issue and has adopted an applicable policy statement[.]

Capps, 2024 WL 880554, at *7-8.

This Court also finds it significant to note that Congress did not disapprove of the amendment during the 180-day review period and allowed it to go into effect in November 2023. The Government's arguments are rejected.

*2. Thomas is Eligible for a Reduced Sentenced Under § 1B1.13(b)(6)*

On the merits, the Government responds that § 1B1.13(b)(6) does not apply because Thomas's sentence was not based on a subsequently lowered statutory mandatory minimum, but instead on the Court's decision of an appropriate term under the sentencing guidelines range of 360 months to life, which remains the advisory guidelines range today. The Government asserts

that if Thomas were sentenced under the law today, the sentence would not necessarily be different.

Subsection 1B1.13(b)(6) authorizes district courts to consider nonretroactive changes in the law (other than nonretroactive changes to the Guidelines Manual) as extraordinary and compelling circumstances warranting a sentence reduction, but only under a narrow set of circumstances. Specifically, the following circumstances must exist: (1) the defendant must be serving an unusually long sentence; (2) the defendant must have served at least 10 years of that sentence; (3) the change in the law must have produced a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed; and (4) the court must have fully considered the defendant's individual circumstances.

These circumstances are present here. As discussed above, the Court finds that Thomas is serving an unusually long sentence. His 480-month sentence, a de facto life sentence, is of itself unusually long, based on Sentencing Commission data that shows how infrequently such sentences are imposed in the federal system. Even fewer de facto life sentences are imposed in drug distribution cases that did not result in a death, such as this case. It is also undisputed that Thomas has served more than ten years of the sentence.

In Apprendi, the Supreme Court held that any factor which increases a criminal defendant's sentence beyond the relevant statutory maximum must be submitted to the jury and proven beyond a reasonable doubt. 530 U.S. at 490. "[T]he Eighth Circuit has consistently held that Apprendi and its progeny are not rules of watershed magnitude and has declined to apply those cases retroactively." Burton v. Fabian, 612 F.3d 1003, 1010 n.4 (8th Cir. 2010). This Court committed Apprendi error in sentencing Thomas because it determined the drug quantity attributable to him and thereby increased the sentence beyond the relevant statutory maximum. Though the sentence was affirmed on appeal, if Thomas were to be sentenced now, the drug

quantity must be based on the jury's verdict—which convicted Thomas of possessing with the intent to distribute in excess of one kilogram of heroin—rather than 10 to 30 kilograms. See Frazier, 280 F.3d 835.

Applying the drug quantity of in excess of one kilogram, Thomas's base offense level would be 30 instead of 36, with two levels added for possession of a firearm and three levels added for his role as a manager/supervisor of the offense, resulting in a total offense level of 35 instead of 41.[17] See U.S.S.G. §§ 2D1.1(a), (b). With a Criminal History Category of V, Thomas's Guidelines sentencing range would now be 262 to 327 months, instead of 360 months to life. Id., § 2D1.1(c) (Drug Quantity Table). Under these circumstances, the Court finds § 1B1.13(b)(6)'s requirement, that the change in the law produce a gross disparity between the sentence being served and the sentence that would likely be imposed today, is met. Thomas has now served in excess of twenty-five years in the BOP, approximately 307 months, which is toward the high end of the new sentencing range.

The Court has already discussed Thomas's individual circumstances above, and reiterates its conclusion that the applicable § 3553(a) factors support Thomas's request for a reduction in sentence. Thomas's motion for a sentence reduction will be granted to time served, pursuant to § 1B1.13(b)(6).

**Conclusion**

For the foregoing reasons, Thomas's motions for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) will be granted pursuant to U.S.S.G. §§ 1B1.13(b)(5) and 1B1.13(b)(6). Thomas will be sentenced to time served. Upon release, Thomas will be subject to the conditions of supervision for a period of ten years on terms previously imposed, with an

---

[17]After Thomas was sentenced, Guidelines Amendment 782 reduced his base offense level from 36 to 34 but did not change his sentencing range.

additional condition of up to four months' placement in a residential reentry center, as determined by the Probation Office. The terms of supervised release will be further amended to remove any conditions no longer applicable and to include other pertinent changes.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Darren Thomas's pro se motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) (ECF No. 1195), Supplemental Motion for Compassionate Release (ECF No. 1208), and Second Supplemental Motion for Compassionate Release (ECF No. 1219) are **GRANTED** as set forth in this Memorandum and Order. Thomas's sentence is reduced pursuant to U.S.S.G. §§ 1B1.13(b)(5) and 1B1.13(b)(6) to **Time Served**, with ten (10) years of supervised release.

**IT IS FURTHER ORDERED** that Defendant Darren Thomas's conditions of supervision are **MODIFIED** to the extent the Court imposes an additional special condition of supervision of up to four months at a residential reentry center, as deemed appropriate by the U.S. Probation Office, and the following special conditions are added in place of the two Additional Supervised Release Terms in the original Judgment:

> You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

> You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

> You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a physical or electronic search conducted by a United States probation officer. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation.

**IT IS FURTHER ORDERED** that an Amended Judgment will be issued separately.

**IT IS FINALLY ORDERED** that the Clerk shall provide a copy of this Order to the

Probation Office and to the Bureau of Prisons.

_Ronnie L. White_

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

Dated this 11th day of June, 2024.